IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SAVE OUR SPRINGS ALLIANCE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:19-CV-762-RP |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| TRANSPORTATION and UNITED STATES | § | |
| FISH AND WILDLIFE SERVICE, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are cross motions for summary judgment filed by Plaintiff Save Our

Springs Alliance, Inc. ("Save Our Springs"), (Dkt. 37), Defendant Texas Department of

Transportation ("TxDOT"), (Dkt. 40), Defendant United States Fish and Wildlife Service ("FWS"),

(Dkt. 41), and the parties' responsive briefs. Having considered the parties' arguments, the evidence,

and the relevant law, the Court will grant Defendants' motions for summary judgment and deny

Save Our Springs' motion for summary judgment.

## I. BACKGROUND

### A.  The Barton Springs Salamander and the Austin Blind Salamander

This case involves two federally listed endangered species—the Barton Springs Salamander

and the Austin Blind Salamander. Both species inhabit Barton Springs and other springs fed by the

Edwards Aquifer. FWS154; FWS401-03.[1] The Barton Springs Salamander and the Austin Blind

Salamander both retain their aquatic forms throughout their lives. *Id.* FWS listed the Barton Springs

Salamander as endangered in 1997 because of the threat posed to the watershed by urbanization,

---

[1] The Court's citations to the administrative record reference files provided to the Court via flash drives from
the parties. (*See* Dkts. 27, 28, 33, 35).

including highway, residential, and industrial development, and listed the Austin Blind Salamander as endangered in 2013 based on threats from urbanization, including decreased water quality and quantity. TAR3830; FWS161; FWS419–37.

### B.   TxDOT's Oak Hill Parkway Project

Due to highway congestion along U.S. Highway 290 and State Highway 71—colloquially known as the Y at Oak Hill—TxDOT developed the Oak Hill Parkway Project (the "Oak Hill Project") to expand the highways. TAR6752; FWS928; FWS933. In this area, the roadways lie over the Edwards Aquifer which feeds the springs inhabited by the Barton Springs Salamander and the Austin Blind Salamander. TAR6782; TAR6846; FWS936. Thus, construction that occurs in the area can affect the water that reaches both salamander species. FWS564. Specifically, construction can affect the Edwards Aquifer's "recharge zone" and "contributing zone." The recharge zone includes areas where faulted and fractured limestone permit water to infiltrate the aquifer, while the contributing zone consists of areas of higher elevation that cause surface water to drain into stream courses overlying the recharge zone. TAR6783; FWS541; FWS958. Approximately two-thirds of the Oak Hill Project will occur in the contributing zone, while approximately one-third will occur over the recharge zone. TAR6822; TAR 6826; FWS541; FWS958. Most of this groundwater underlying segments of the Oak Hill Project discharges at Barton Springs, just over four miles northeast of the construction. TAR6826. Williamson Creek and Slaughter Creek are also located in the project area. FWS936.

The Oak Hill Project will add approximately 74 acres of impervious cover to the area and result in the construction of approximately 723 columns, many of which will be placed in the recharge zone. TAR3825; FWS934; FWS945; FWS1339. The columns will range in diameter from 3 to 15 feet and in depth from 19 to 40 feet. FWS945. The water quality in the Edwards Aquifer can be affected by certain construction- and development-related contaminants, including total

suspended solids ("TSS"), total organic carbon, dissolved pollutants such as heavy metals and petroleum hydrocarbons, nutrients, dissolved oxygen, and chemicals such as pesticides and herbicides. TAR3831.

### C.  ESA Consultation

The primary issues in this case stem from TxDOT's consultation with FWS pursuant to the ESA. In a biological resources technical report published on the Oak Hill Project in 2015, TxDOT identified the Austin Blind Salamander and the Barton Springs Salamander as species whose may be affected by the project. TAR3710. On September 1, 2017, TxDOT sent a letter to FWS to request a consultation on the Oak Hill Project under ESA § 7(a)(2). TAR3819; FWS926–27. TxDOT attached a biological assessment of the project, which included a biological technical report, a preliminary water quality analysis, and proposed best management practices. FWS928–1379. TxDOT stated that it had determined that "the project is not likely to adversely affect the" Barton Springs Salamander or the Austin Blind Salamander. TAR3819. Specifically, TxDOT found that limited excavation and the implementation of best management practices would maintain water quality, and "any direct impact to these species would be immeasurable (insignificant) and extremely unlikely to occur (discountable)." TAR3836.

Regarding the best management practices, TxDOT stated the practices "will protect surface water and groundwater in the project area by minimizing erosion, reducing TSS, reducing the rate and velocity of discharged stormwater, which would decrease flood potential and thus reduce the amount of roadway contaminants potentially reaching the Barton Creek watershed . . . ." FWS949. Specifically, TxDOT explained that "the following [best management practices] have been recommended" for permanent water quality protection: (1) upstream stormwater detention ponds; (2) bioretention ponds; (3) vegetative filter strips; and (4) hazardous materials traps. TAR3737–38. TxDOT added that additional best management practices may be applied to the project to minimize

impact to water quality, including erosion and sediment control, roadside drainage, and revegetation. FWS1377–78. In support of its best management practices, TxDOT cited a 2016 report by Michael Barrett ("Barrett"), a professor at the University of Texas at Austin, which examined the results of over 20 years of water quality data at Barton Springs. TAR3736. TxDOT also noted that the best management practices it would apply were based on voluntary measures recommended in the Texas Commission on Environmental Quality's "Edwards Aquifer Rules." TAR3737.

Discussions and site visits between TxDOT and FWS ensued, and FWS reached out to TxDOT on different occasions to ask questions about TxDOT's analysis. *See, e.g.*, FWS1436–37 (requesting additional information about the Oak Hill Project's impact on TSS, recharge zones, and excavation). TxDOT informed FWS that the project would result in a net reduction of TSS released from the project area as a result of the water quality controls; that buffers would be established to prevent impacts to Williamson Creek; and that the drill shafts for the columns would not intercept with the aquifer. *Id.* On December 20, 2017, FWS issued a letter concurring with TxDOT's determination that the Oak Hill Project "may affect" but is "not likely to adversely affect" the salamander species. FWS1460–66. In its concurrence, FWS cited its own additional research into the water patterns of the Edwards Aquifer, Barton Springs, and the surrounding creeks. *See* FWS1462–64. Based on the information provided by TxDOT and its own research, FWS concluded that TxDOT's best management practices would maintain water clarity, reduce pollutants, and prevent the construction intersecting with the water table. FWS1465–66. FWS further stated that "[n]o further endangered species consultation will be required," subject to certain limitations. FWS1466.

In May 2018, TxDOT published a draft Environmental Impact Statement ("EIS") for the Oak Hill Project and sought public comments. TAR4248. In September 2018, TxDOT advised FWS that the Barton Springs Salamander had been discovered outside of Barton Springs, including at a new location in Backdoor Springs. TAR6441. FWS determined that its concurrence letter remained

unchanged, as "the new salamander site is approximately 7 miles in distance away" from the project and the project "has no net increase to TSS." TAR6693. TxDOT responded to this, advising FWS that Backdoor Springs was only 3 miles away from the project site, but that "estimating surface mile distances is not particularly relevant" because "surface drainage from [the Oak Hill Project] does not drain to Barton Creek." TAR6692. TxDOT further stated that although "there are no recent flow-path model[s]" for Backdoor Springs, "the net reduction of TSS leaving the site would continue to support our May Affect Not Likely to Adversely Affect determination." *Id.* FWS again responded, stating that its "concurrence letter remains unchanged given the reasons" stated by TxDOT. *Id.* In TxDOT's final EIS, it states that Backdoor Springs is located "approximately 1.68 miles north of the MoPac/US 290/SH 71 interchange." TAR6846.

FWS again reaffirmed its concurrence with TxDOT in late 2018. TxDOT reported to FWS that it had made an error calculating the TSS load leaving the project area in November 2018. FWS1479–80; FWS1488–90. The corrected calculation showed a net increase in TSS leaving the site, rather than the anticipated net reduction. *Id.* While FWS was considering this information, TxDOT notified FWS that it was committed to achieving a net reduction of TSS and would prepare a Water Pollution Abatement Plan ("WPAP") to comply with this commitment. *Id.* TxDOT also noted that it would consider additions to its best management practices, including water quality ponds, adding batch detention or sand filter ponds, and adding permeable friction course pavement. *Id.* On December 7, 2018, FWS responded, stating "[i]f the proposed project does not result in a net increase in TSS loading as was described in the original BA, the Dec. 20, 2017, concurrence letter still applies." FWS1491.

In December 2018, TxDOT published its final EIS and record of decision. TAR6702. In it, TxDOT stated that it would implement specific proposed drainage and water quality treatment improvements that would result in a net decrease in TSS loading, such as upstream detention ponds

and water quality ponds. TAR6828. The EIS further states that the Edwards Aquifer Rules promulgated by the Texas Commission on Environmental Quality require that the Oak Hill Project be designed to remove at least 128,116 pounds of TSS annually, but that the Oak Hill Project's post-construction TSS removal levels are expected to exceed this requirement by approximately 15,649 pounds. TAR6837.

Finally, on January 9, 2020, TxDOT submitted to FWS proposed design changes to the Oak Hill Project. FWS1512–20. The design changes "incorporate[d] new rainfall data associated with the updated Atlas 14 hydrologic model released by the National Oceanic and Atmospheric Administration (NOAA) in September 2018." FWS1513. The modifications to the project included alterations to impervious cover, modifications to the water-quality best management practices, and revised excavation volumes to account for the Atlas 14 model's projection of "an increase of three inches in precipitation during a 24-hr period when compared to previous estimates." *Id.* TxDOT maintained its commitment to a net decrease in TSS load and stated that the changes did not involve excavation depths that would approach the water table. FWS1513–17. Based on the proposed modifications, TxDOT concluded "that there should be no change in the effect determinations for the BSS and ABS as presented in the 2017 concurrence letter. TxDOT requests that the Service re-affirm its concurrence with the effect determinations." FWS1519. On February 6, 2020, FWS issued a letter reaffirming its concurrence based on the modifications TxDOT was recommending. FWS1876–79. After detailing the proposed changes and their impacts, FWS stated "[t]he inclusion of [best management practices] in the project design provide for minimization of TSS and other pollutants during construction by significantly reducing the offsite transport of these pollutants into the aquifer . . . ." FWS1877.

### D.   Procedural History

Save Our Springs filed its complaint on July 29, 2019, arguing that TxDOT's consultation process with FWS violated the ESA and seeking declaratory and injunctive relief. (Compl., Dkt. 1). Two months after this case was filed, a sister court in this District filed findings of fact and conclusions of law in a case filed by Save Our Springs and other plaintiffs seeking similar relief to the present case, but regarding a different construction project on the Mopac Expressway. Final J., *Ctr. For Biological Diversity v. TxDOT*, No. 1:16-cv-876-LY (W.D. Tex Sept. 30, 2019), ECF No. 99. The court in *Center for Biological Diversity* entered judgment in favor of the Defendants. *Id.*

Just days the after court in *Center for Biological Diversity* issued its order, TxDOT moved to dismiss Save Our Springs' complaint in part on October 3, 2019, while FWS filed its answer on October 11, 2019. (Dkts. 10, 13). The Court denied TxDOT's motion to dismiss in part on June 26, 2020. (Dkt. 22). Defendants filed their administrative records on November 4, 2020, and their supplements on May 6 and May 7, 2021. (Dkts. 27, 28, 33, 35). Save Our Springs filed the present motion for summary judgment on July 2, 2021, (Dkt. 37), and Defendants filed their cross motions on October 5, 2021. (Dkts. 40, 41).

### II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences

are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

If the moving party does not bear the ultimate burden of proof, after it has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). When the movant bears the burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).

Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000). Cross-motions for summary judgment "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004).

## III. DISCUSSION

### A.  Legal Framework and Controlling Regulatory Schemes

1.  Endangered Species Act

Congress enacted the ESA in 1973 to "provide a means whereby the ecosystems upon which endangered species . . . depend may be conserved" and to "provide a program for the conservation of . . . endangered species." *See* 16 U.S.C. § 1531(b). Under the ESA, "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." *Id.* at § 153l(c)(1). To further the policy of the ESA, Section 7 provides that, "[e]ach Federal agency shall, in consultation with and with the assistance of [FWS], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Both the "action agency" and the FWS "shall use the best scientific and commercial data available" in "fulfilling the requirements" imposed upon them to consult with the FWS and ensure that an action is "not likely to jeopardize" the endangered or threatened species or destroy or adversely modify such species' habitat. *Id.*

The ESA defines "[f]ederal agency" as "any department, agency, or instrumentality of the United States." *Id.* at § 1532(7). TxDOT functions as an action agency that is required to comply with the ESA because it was assigned responsibilities for "environmental review, consultation, or other action" by the Federal Highway Administration. *Id.* at § 1532(7); *see also* 23 U.S.C. § 327(a)(2)(B)(i). An action agency "shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a). If it is determined that a proposed action "may affect" a listed species or critical habitat, the action agency is generally required to engage in "formal consultation" with the FWS. *Id.* Alternatively, an action

agency need only engage in "informal consultation" if an action is "not likely to adversely affect" a listed species or critical habitat. *Id.* at § 402.13(a), 402.14(b)(1).

An "informal consultation" is "an optional process that includes all discussions, correspondence, etc., between [FWS] and the [action] agency . . . designed to assist the [action] agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13; *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 693 n.8 (5th Cir. 2010) (discussing the informal consultation process). Most consultations between an action agency and the FWS begin as an informal consultation. *Id.* An informal consultation between FWS and an action agency is governed by § 402.13. *See* 50 C.F.R. § 402.13. FWS may issue a written concurrence for a proposed action "during informal consultation," if the action "is not likely to adversely affect" an endangered species.[2] *Id.* §§ 402.13, 402.14(b). Section 402.13 provides FWS with the latitude to begin an informal consultation with one stance and end the consultation process with a different stance. *See* 50 C.F.R. § 402.13(a) ("If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated"); *see also Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 696 n.16 (noting FWS "briefly withheld its concurrence" before "officially concur[ring]" after receiving clarification about potential project impacts on endangered species). During the consultation, FWS may "suggest modifications" to an agency's proposed action so as to "avoid the likelihood of adverse effects to listed species or critical habitat," though FWS is not obliged to do so.

---

[2] A determination of "[m]ay affect, but is not likely to adversely affect species . . . is appropriate when effects to the ESA-listed species are expected to be beneficial, discountable, or insignificant . . . . Insignificant effects relate to the size of the impact (and should never reach the scale where take occurs), while discountable effects are those that are extremely unlikely to occur." U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* (1998), at B-55, https://www.fws.gov/endangered/esalibrary/pdf/esa_section7_handbook.pdf (Handbook) (hereinafter, "Consultation Handbook").

*See* 50 C.F.R. § 402.13(b) ("During informal consultation, the Service *may* suggest modifications . . . .") (emphasis added).

If an action agency and FWS "do not agree after informal consultation that the proposed action is not likely to adversely affect listed species, then a formal consultation is required." *Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 693 n.8 (citing 50 C.F.R. § 402.14). Thus, absent FWS's concurrence, or a non-concurrence letter sent by the FWS to an action agency, formal consultation is triggered. *See* 50 C.F.R. § 402.14(a), (b)(1) (detailing the formal consultation requirement and exception to formal consultation when "the Federal agency determines, with the written concurrence of the Director [of FWS], that the proposed action is not likely to adversely affect any listed species or critical habitat."); *see also Sierra Club v. Glickman*, 156 F.3d 606, 619 (5th Cir. 1998) ("[B]ecause [FWS] concurred in the USDA's conclusion, formal consultation is not required."). A formal consultation entails more stringent requirements for both FWS and the action agency than does informal consultation. *Compare* 50 C.F.R. § 402.14 (formal consultation) *with* 50 C.F.R. § 402.13 (informal consultation). In addition, "if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered, or if the action is modified in a manner that causes an effect to the listed species or critical habitat that was not considered" during consultation, reinitiation of consultation is required. 50 C.F.R. § 402.16.

2.   Administrative Procedures Act

Under the Administrative Procedures Act ("APA"), courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Thus, courts review a challenge to an agency action taken under Section 7 of the ESA under the APA for arbitrariness and capriciousness. *See* 5 U.S.C. § 706(2)(A); *Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699; *see also Sierra Club*, 67 F.3d 90, 95 (5th Cir. 1995). Further, courts assess the determination of an agency, including

concurrence letters derived from informal consultation, for arbitrariness and capriciousness. *See Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699 (applying arbitrary-and-capricious standard of review to federal agency's concurrence with Texas agency's determination that proposed action was unlikely to affect endangered species).

Under this standard of review, courts are highly deferential to an agency and will only overturn the agency's action if the action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699. Courts are especially deferential to an agency where the controversy in question concerns the technical expertise of the agency. *See id.* at 699 (citing *Marsh v. Or. Natural Gas Res. Council*, 490 U.S. 360, 376–77 (1989)). Indeed, an agency "must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, [a court] might find contrary views more persuasive." *Id.*

When reviewing for arbitrariness and capriciousness, courts consider whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of US., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Nor should the court "reweigh the evidence." *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Instead, the court should look to "whether the decision was based on a consideration of

the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011); *see also Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699 ("Under this standard, we must assure ourselves that the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purpose, and there is substantial evidence in the record to support it; but, we cannot substitute our judgment for that of the agency.") (citing *Public Citizen, Inc. v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)). Although arbitrary-and-capricious review is narrow, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang*, 565 U.S. at 53.

### B.  First Cause of Action: The 2017 Consultation Process

Save Our Springs seeks summary judgment on each of the four causes of action alleged in its complaint. (Dkt. 37, at 1). The first cause of action asserts that Defendants failed to use the best scientific data available in their 2017 determination that the Oak Hill Project "may affect" but is "not likely to adversely affect" the salamander species. (Compl., Dkt. 1, at 21). Specifically, Save Our Springs argues that FWS's concurrence was arbitrary and capricious because it failed to establish the "action area" or the "environmental baseline" as required by ESA regulations. (Dkt. 37, at 15–16).

Save Our Springs asserts that defining the action area is particularly important in this instance because of how water will flow downstream from the Oak Hill Project to the salamanders' habitat. (*Id.* at 16). Save Our Springs further asserts that neither TxDOT nor FWS analyzed the "environmental baseline"—in other words, the past and present impacts of all federal, state, or private action in the action area, 50 C.F.R. § 402.02. (Dkt. 37, at 16). The only baseline referred to in the 2017 concurrence letter, Save Our Springs states, is TxDOT's baseline for the TSS currently leaving the area. (*Id.* at 17). This fails to encompass the entirety of the effects the Oak Hill Project will have on the salamanders, Save Our Springs argues, and implies the Oak Hill Project is

happening in a vacuum without consideration of the other interrelated or interdependent activities going on in the area. (*Id.* at 16–17).

Save Our Springs also argues that Defendants are using the guise of informal consultation to get around the ESA's requirements that they establish an action area and environmental baseline. (Dkt. 43, at 10–12). Save Our Springs argues that while the regulation does not explicitly require Defendants to delineate an action area and environmental baseline during informal consultations, the regulatory history of the ESA and the case law show that these are required findings regardless of the type of consultation. (*Id.* at 12–15).[3]

FWS and TxDOT filed cross motions for summary judgment on Save Our Springs' first cause of action. Both Defendants aver that they properly engaged in an informal, as opposed to a formal, consultation, and that defining the action area and environmental baseline is not required during informal consultations. (Dkt. 40, at 24; Dkt. 41, at 11–15). FWS argues that the regulations governing the implementation of the ESA define informal consultation, and expressly state that if the action agency and FWS determine an action is not likely to affect a listed species, the "consultation process is terminated, and no further action is required." 50 C.F.R. § 402.13. Meanwhile, the regulation governing formal consultations states that FWS must "evaluate the current status and environmental baseline of the listed species" and the action agency must offer a

---

[3] Save Our Springs also takes issue with the process TxDOT and FWS engaged in to arrive at FWS's 2017 concurrence. First, Save Our springs argues that FWS failed to engage in independent analysis when writing its 2017 concurrence letter, as "entire paragraphs were lifted from TxDOT's" biological assessment" and FWS failed to add "any biological expertise to the discussion." (*Id.* at 24). This is especially troubling, Save Our Springs asserts, given that FWS's statements in the concurrence "contradict the FWS's statements" listing the salamanders as endangered species. *Id.* Save Our Springs states that "[i]n such cases, no deference" to FWS's analysis is owed." *Id.* (citing *Defenders of Wildlife v. Babbitt*, 958 F. Supp. at 670). The Court declines to find that FWS's concurrence was arbitrary and capricious for this reason, as during an informal consultation, FWS may suggest modifications to the action agency's plan, but is not obliged to do so. *See* 50 C.F.R. § 402.13(b) ("During informal consultation, the Service *may* suggest modifications . . . .") (emphasis added).

description "of all areas to be affected . . . by the [action], and not merely the immediate area involved in the action (*i.e.* the action area . . .)." *Id.* § 402.14.

FWS likewise points to the Consultation Handbook, which it argues reaffirms the regulation's statement that when the action agency and FWS determine an action will not likely affect an endangered species, "the Service provides a letter of concurrence, which completes the informal consultation." Consultation Handbook, at 3–15. FWS argues that formal consultations reasonably require a more stringent analysis because, in order to initiate a formal consultation, the action agency and FWS must determine a project is "likely to adversely affect" a species; there is no need to engage in this additional analysis in an informal consultation because the parties have already found that a project is "not likely to adversely affect" the species. (Dkt. 41, at 21). Finally, TxDOT notes that other district courts have concluded informal consultations do not require the same level of analysis as formal consultations. (*See, e.g.*, Dkt. 40, at 24) (citing *Jones v. Nat'l Marine Fisheries Serv.*, 2011 WL 4501956, at *7 (D. Or. Sept. 27, 2011) ("Finally, despite noting that this is an informal consultation case, plaintiffs assert that NMFS was required to establish an environmental baseline . . . . This assertion is contrary to the plain language of the regulatory requirements regarding informal consultation.")). Finally, TxDOT points out that although TxDOT and FWS were not required to agree on an action area during the informal consultation process, TxDOT did define the action area of the Oak Hill Project in the biological assessment it submitted to FWS when seeking FWS's concurrence. (Dkt. 40, at 24 n.6) (citing TAR3826).

After considering the parties' arguments, the Court finds that FWS and TxDOT have established that there is no issue of material fact as to whether they failed to meet their burden to define the action area and environmental baseline, and that they are entitled to judgment as a matter of law. Regarding the action area, the Court finds that TxDOT indeed defined the action area of the Oak Hill Project in the biological assessment it submitted to FWS. Citing to the regulations'

definition of "action area," TxDOT notes that neither species of endangered salamander is "present within the existing or proposed right-of-way," but that known locations of the species are downgradient from the project area. TAR3826. TxDOT considered, and then dismissed, the possibility that runoff from the action area would cause "a detectable effect on the individual salamanders" because the water "would be subject to mixing and dilution from both the existing groundwater and surface water recharging from other features." *Id.*

Given TxDOT's consideration of whether the salamander species' habitats exist within the action area, as well as how runoff from the project area might affect salamander populations *outside* of the action area, the Court holds that TxDOT considered "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. FWS then reviewed TxDOT's analysis and concurred, stating "[w]e agree that the effects of the proposed action on these species are insignificant and will not result in adverse effects." FWS1464. Given this, the Court cannot conclude that TxDOT and FWS acted arbitrarily and capriciously in their assessment of the action area. Thus, the Court does not reach the question of whether defining the action area is required during informal consultations.

As for the environmental baseline, the Court agrees with Defendants' analysis demonstrating that the environmental baseline need not be determined during an informal consultation. The Court notes the regulations specific language: "Service responsibilities during *formal consultation* are as follows: . . . (2) Evaluate the current status and environmental baseline of the listed species or critical habitat." 50 C.F.R. § 402.14(g) (emphasis added). No such requirement exists in the regulation governing informal consultations—instead, informal consultations are regarded as communications between the agencies to determine "whether formal consultation . . . is required." *Id.* § 402.13. Further, the regulations on informal consultations explicitly state what information the action agency is required to present to FWS, *id.* § 402.13(c)(1), and the list does not include delineation of the

environmental baseline. *Id.* The Court is buoyed by the fact that other district courts have reached

the same conclusion. *See, e.g.*, *Jones.*, 2011 WL 4501956, at *7; *Pac. Coast Fed'n of Fishermen's Ass'ns v.

*Nat'l Marine Fisheries Servs.*, 482 F. Supp. 2d 1248, 1267 (W.D. Wash. 2007) ("Additionally, some

projects may proceed by informal consultation, which does not assess cumulative impacts or

the environmental baseline."). As such, the Court concludes that Defendants' approach to the action

area and environmental baseline regulations was not arbitrary and capricious as a matter of law.

### C.   Second Cause of Action: Consideration of Direct, Indirect, and Cumulative Effects

Save Our Springs seeks summary judgment on its claim that Defendants failed to consider

the direct, indirect, and cumulative effects of the Oak Hill Project, as required by the regulations. (*Id.*

at 17–18).

#### 1.   Direct and Indirect Effects

Save Our Springs argues that Defendants failed to properly "examine the relevant factors

and articulate . . . a rational connection between the facts found and the choice made," by failing to

consider the following direct effects Save Our Springs alleges will impact the salamander species. (*Id.*

at 24) (citing *Motor Vechicle Mfrs. Ass'n*, 463 U.S. at 43). First, Save Our Springs asserts, Defendants

failed to assess how impervious cover, both generally and during construction, will threaten the

salamanders, even though the negative impacts of impervious cover on water quality have been

documented by both FWS and other agencies. (*Id.* at 18–19). Further, Defendants' reliance on dye

studies to determine the length of time it would take water from the project area to discharge at the

Springs oversimplifies the analysis by failing to recognize that there are other recharge zones in the

project area not considered in the dye studies. (*Id.* at 19–20). Save Our Springs asserts that there is

evidence in the administrative record suggesting additional recharge features in the project area may

experience runoff from the project, impacting water quality in the salamanders' habitat in a way not considered by Defendants. (*Id.* at 20) (citing TAR4210–13; TAR7562–63).[4]

Save Our Springs also takes issue with Defendants' conclusions regarding void mitigation measures and excavation. In its proposed best management practices submitted to FWS during the 2017 consultation, TxDOT detailed the "Standard Void Mitigation Measures" it would implement in the event that a previously unknown recharge feature is encountered during construction. TAR1379. However, Save Our Springs takes issue with these measures, as "[c]ontaminants can rapidly enter the aquifer" when a void is intersected, and thus a strategy of waiting until a void is discovered to mitigate the effects will not effectively protect the water the salamanders depend on. (Dkt. 37, at 20–21). This reactive, rather than proactive, approach to protecting the salamanders runs contrary to the ESA's mandate, Save Our Springs argues. (*Id.* at 21) (citing *Tenn. Valley Auth.*, 437 U.S. at 173–74). Further, the "Standard Void Mitigation Measures" do not account for construction intersecting with smaller voids, the cumulative effects of which may be substantial. (*Id.*). And while TxDOT and FWS determined that excavation and the construction of the project's columns would not reach the Edwards Aquifer water table, Save Our Springs asserts that the project's excavation and the construction of columns do run the risk of intersecting with voids and other recharge features, and that Defendants have failed to account for this reality. (*Id.* at 21–22).

Finally, Save Our Springs takes issue with Defendants' theory that any runoff of contaminants from the Oak Hill Project will be diluted by the time the water reaches the

---

[4] Save Our Springs also argues that Defendants' reliance on Barrett's paper was an abdication of their responsibility to use the best available science, as Barrett's report was unpublished and not peer-reviewed. (Dkt. 43, at 28). TxDOT responds that while it did consider Barrett's analysis, it bolstered the science with the Edwards Rules promulgated by the Texas Commission on Environmental Quality, among other sources. The Court will not find TxDOT's consultation request or FWS's concurrence to be "arbitrary" or "capricious" on the basis that they cited Barrett's report, as the Court notes Defendants relied not only on Barrett's report, but also on additional sources, including the Edwards Rules. As the court in *Center for Biological Diversity* holds, "the Service and TxDOT acted in accordance with the law when choosing to comply with the Edwards Aquifer Rules." *Ctr. for Biological Diversity*, 2019 WL 12313647, at *16.

salamanders' habitat. (*Id.* at 22–23). Specifically, Save Our Springs asserts Defendants failed to consider how "[t]he impacts of highway runoff alone . . . generally are not significant when considered singly, but may result in degradation of water quality when combined with other sources . . . ." TAR674. At least three other highway construction projects are being planned in the recharge zone, and Save Our Springs argues that the combined runoff from all of these projects undercuts Defendants' dilution theory, making their reliance on the likelihood of dilution arbitrary and capricious. (*Id.* at 23). In addition, Save Our Springs takes issue with Defendants' apparent failure to address other potential water contaminants besides TSS. (*Id.* at 23–24).

Save Our Springs also argues that Defendants wholly failed to consider potential indirect effects, which are effects "that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. Because Defendants impermissibly classified direct effects as indirect effects, Save Our Springs asserts, they failed to examine the actual indirect effects of the Oak Hill Project, the primary one being induced development as a result of the construction. (*Id.* at 25). In *Nat' Wildlife Fed'n v. Coleman*, the Fifth Circuit found induced development from a highway to be an indirect effect of highway expansion. 529 U.S. 359 (5th Cir. 1976). Save Our Springs acknowledges that in TxDOT's Indirect and Cumulative Impacts Analyses Technical Addendum, which was completed one year after the 2017 concurrence, TxDOT includes induced development as an effect of the Oak Hill Project, but argues that the failure to consider these effects during the initial consultation process was arbitrary and capricious. (Dkt. 37, at 26).

TxDOT and FWS filed cross motions, countering Save Our Springs' arguments that Defendants failed to properly consider the direct and indirect effects of the Oak Hill Project. First, Defendants both address Save Our Springs' assertion that Defendants impermissibly classified direct effects as indirect effects. Specifically, they defend their decision to classify the Oak Hill Project's impact on water quality as an "indirect effect." (Dkt. 40, at 24–25; Dkt. 41, at 22). FWS argues that

Save Our Springs' argument puts form over substance and does not suggest an arbitrary and capricious error, as the administrative record demonstrates that the Oak Hill Project's impact on water quality was thoroughly analyzed, regardless of whether it is categorized as a direct or indirect effect. (*Id.*). Further, FWS argues both Defendants considered "the potential for direct effects to salamanders in the immediate project area and the potential for indirect effects that would occur downgradient, and thus be later in time." (*Id.* at 23). TxDOT makes the same arguments, and notes that the regulation distinguishes indirect effects from direct effects as "impacting species individuals or habitat 'later in time,' not immediately, while still being reasonably certain to occur." 50 C.F.R. § 402.02. Regardless, TxDOT argues, "the specific classification of a given effect is immaterial from a regulatory perspective, so long as the effect is considered." (Dkt. 40, at 25).

Next, Defendants dispute Save Our Springs' representation that Defendants did not adequately assess the effect of impervious cover. Specifically, FWS argues that both TxDOT and FWS considered the increase in impervious cover as a result of the project and found that the best management practices proposed by TxDOT would prevent the added impervious cover from adversely affecting the salamanders. (Dkt. 41, at 23). Defendants also dispute Save Our Springs' assertion that TxDOT and FWS have failed to consider the possibility that unknown recharge zones may be present in the project area. Both FWS and TxDOT cite TxDOT's 2016 geologic assessment identifying and detailing six recharge features within the project area. TAR4827–33. In 2019, TxDOT updated the geologic assessment to include seven additional recharge features and provided this information to FWS. TAR1802–14. When TxDOT reported the updated geologic assessment to FWS, it sated that of the newfound features, "[n]o additional sensitive recharge features or features containing suitable karst invertebrate habitat were observed." FWS1518. FWS had this information when it issued its February 6, 2020 letter reaffirming its concurrence. FWS1876–79.

TxDOT and FWS likewise dispute Save Our Springs' arguments that Defendants have not developed sufficient void intersection mitigation measures or fully considered the impact of excavation. TxDOT notes that the void mitigation measures in the Oak Hill Project plan come directly from the Edwards Rules developed by the Texas Commission on Environmental Quality. The Edwards Rules provide guidelines for the actions an agency must take when it encounters a previously unknown void, including voids that are small in size:

> "Voids discovered in drilled shafts that are greater than 6 inches across in any direction will require assessment to determine whether mitigation measures are appropriate . . . Voids discovered in drilled shafts that are greater than 12 inches across in any direction will require steel casing within the shaft that extends a minimum of 12 inches above and below the extent of the void's opening . . . All voids that require action shall be temporarily covered with a plastic tarp . . . Erosion control logs shall be placed around the feature . . . [and] work within 50 feet of the void shall be suspended."

FWS1379. FWS expresses confusion at Save Our Springs' assertion that its mitigation measures do not properly account for encountering unknown voids during excavation, stating "it is not clear how mitigation on an unknown void could be implemented prior to its discovery." (Dkt. 41, at 26).

Defendants also counter Save Our Springs' argument that their dilution theory fails to account for contaminants running off of other highway projects in the area. Both Defendants point to the administrative record, where they have acknowledged that "the aquifer has little ability to filter contaminants," leaving its water quality "highly dependent on the quality of surface water flowing over the Recharge Zone." TAR3828; FWS1463. In so noting, they developed best management practices to decrease the amounts of contaminants leaving the site, including void mitigation, erosion control, sediment control, roadside drainage, revegetation, and buffers. FWS1378–79. As a result, they argue, the agencies have determined there will be a net decrease in the amount of TSS leaving the site compared to the existing condition. FWS1489.

Finally, both Defendants filed cross motions for summary judgment on the issue of whether they properly considered the indirect effect of "induced development." (Dkt. 40, at 30–32; Dkt. 41,

at 32–33). TxDOT points to its Indirect Impacts Analysis Technical Report published in June 2017, which specifically discusses the potential for induced development in the area. TAR6165. In the report, TxDOT explains the results of a study, which found that the project likely *would not* specifically induce development given the already high rate of growth in the area. TAR6168. This study was referenced in the biological assessment provided to FWS in 2017, which prompted FWS to write its 2017 concurrence. TAR3838–39.

Based on the foregoing arguments, the Court holds that TxDOT and FWS have established that there are no issues of material fact and that they are entitled to judgment as a matter of law on the issue of whether they properly analyzed the direct and indirect effects of the Oak Hill Project. First, the Court agrees with Defendants that disagreements over whether the impacts to water quality should be analyzed as direct effects rather than indirect effects puts form over substance, as the administrative record demonstrates TxDOT and FWS addressed each of Save Our Springs' water quality concerns during their communications and consultations. *See, e.g.*, FWS1465; TAR4827–33; TAR1802–14; FWS 1518; FWS1378–89; FWS1489; TAR6828; TAR3838–39. The Court will not find TxDOT and FWS's consultation arbitrary and capricious based on a dispute over how they classified certain types of effects, as the evidence demonstrates the effects were considered regardless. *See id.*

The Court further finds that there is a rational connection between TxDOT's analysis of impervious cover and FWS's concurrence letter in 2017. As the court in *Center for Biological Diversity* noted, "[t]he service's evaluation of whether TxDOT's best-management practices are sufficient to negate the deleterious impacts cause by an increase in impervious cover falls squarely within the Service's sphere of expertise. As such, the court's review of the Service's ultimate conclusion that the best-management practices are sufficient is very deferential." 2019 WL 12313647, at *11. In its concurrence letter, FWS notes that the Oak Hill Project will include two upstream detention ponds

and 17 water quality ponds to mitigate for increased impervious cover. FWS1465. "Applying a most-deferential standard, the court concludes there is a 'rational connection' between TxDOT's mitigation measures and the Service's conclusion that impervious cover was not likely to adversely affect the salamanders . . . ." *Ctr. for Biological Diversity*, 2019 WL 12313647, at *12.

The Court reaches the same conclusion regarding the possibility of unknown recharge zones being impacted by excavation in the project area. Save Our Springs argues Defendants fail to account for recharge zones in the project area not considered in the dye studies. (*Id.* at 19–20). However, the record evidence demonstrates that TxDOT repeatedly assessed the project area for recharge zones, and updated FWS when additional zones were found. TAR4827–33; TAR1802–14. Further, TxDOT and FWS agreed on measures to mitigate harm that might be caused by undiscovered recharge zones, such as buffer zones around known recharge features. FWS1464. Although Save Our Springs may still have concerns that construction will intersect with unknown recharge zones, the Court concludes that TxDOT and FWS adequately considered this and determined that any such possibility was "not likely to adversely affect the salamanders." *See Harris v. United States*, 19 F.3d 1090, 1096 n.8 (5th Cir. 1994) (stating that in a battle between an agency and a non-agency regarding the results of the agency's application of scientific and technical expertise, "we defer to the agency's interpretation").

The Court likewise finds that neither TxDOT nor FWS has acted in an arbitrary or capricious manner in response to possible void intersections due to excavation. Save Our Springs made similar arguments regarding possible void intersections and the treatment of small voids in *Center for Biological Diversity*, and the agencies responded with the same arguments they have promulgated here: that the Edwards Rules void mitigation measures are sufficient to protect the salamander species from any unintentional intersections with voids during construction. 2019 WL 12313647, at *20–22. Considering TxDOT's detailed mitigation measures, *see* FWS1379, and *Center*

*for Biological Diversity*'s well-reasoned opinion on the same issue, this Court likewise concludes "the Service considered the relevant facts regarding void mitigation and articulated a rational connection between the potential risks posed by void encounters and its ultimate concurrence with TxDOT's 'may affect, not likely to adversely affect' determination." 2019 WL 12313647, at *22 (citing *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; *Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699).

Further, TxDOT and FWS have established that they are entitled to judgment as a matter of law on the issue of dilution. The Court finds that there is a "rational connection between" the implementation of the proposed best management practices and Defendants' determination that those practices will result in a net decrease of TSS leaving the Oak Hill Project site. *See Motor Vehicle Mfrs. Ass'n of US., Inc.*, 463 U.S. 29, 43 (1983). As stated by TxDOT in its EIS:

> During construction, TCEQ-approved measures to reduce erosion and maintain sediment on site would be implemented and documented in the Stormwater Pollution Prevention Plan (SW3P). Management of post-construction runoff for the proposed project would also be accomplished with permanent TCEQ-approved measures that would capture and treat the first flush . . . . Two upstream detention ponds and up to 17 water quality ponds are proposed as part of the *Preferred Alternative* design. *These proposed drainage and water quality treatment improvements would result in a decrease in the annual TSS loading* . . . . It is anticipated that the proposed OHP Project would result in negligible impacts to water quality. The risk would be mitigated by the incorporation of permanent TCEQ-approved BMPs that are properly maintained throughout the life of the project. The proposed BMPs would protect surface water and groundwater in the project area by minimizing erosion, reducing TSS, and reducing the rate and velocity of discharged stormwater. These features would decrease flood potential and reduce the amount of roadway contaminants potentially reaching the sensitive recharge features or the Barton Creek watershed during storm events.

TAR6828 (emphasis added). Given Defendants' well-documented measures intended to decrease run-off, Defendants did not act arbitrarily or capriciously in upholding their finding of "not likely to adversely affect." *See* 5 U.S.C. § 706(2)(A); *Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699.

Finally, the Court concludes that Defendants indeed considered the possible effects of induced development as a result of the Oak Hill Project and determined that induced development specifically because of the project was unlikely due to the already high rate of growth in the area.

TAR6165. A court may find an agency action arbitrary and capricious when "the agency . . . entirely failed to consider an important aspect of the problem," but that is not the case here. *Motor Vehicle Mfrs. Ass'n of US., Inc.*, 463 U.S. 43. Instead, Defendants assessed the possibility of induced development and ultimately concluded it did not change their determination that the Oak Hill Project was "not likely to adversely affect" the salamanders. The Court may not "substitute its judgment for that of the agency," so long as it is assured that the agency "considered the relevant factors." *Medina Cty. Envtl. Action Ass'n*, 602 F.3d at 699. Given the foregoing conclusions, the Court finds that TxDOT and FWS have established that there are no issues of material fact and that they are entitled to judgment as a matter of law on the issue of whether they properly analyzed the direct and indirect effects of the Oak Hill Project.

2.   Cumulative Effects

Save Our Springs also seeks the Court's judgment that Defendants' alleged failure to analyze the cumulative effects of the Oak Hill Project was arbitrary and capricious. Among the cumulative effects Defendants should have considered, Save Our Springs argues, are other construction projects happening in the same area; groundwater withdrawals managed by the Barton Springs Edwards Aquifer Conservation District; and other housing and commercial developments surrounding the project. (Dkt. 26–27). Save Our Springs acknowledges, but disagrees with, *Center for Biological Diversity*'s conclusion, which held that cumulative effects were not required to be analyzed during an informal consultation. *Ctr. for Biological Diversity v. Tex. Dep't of Transp.*, No. 1:16-CV-876-LY, 2019 WL 12313647 (W.D. Tex. Sept. 30, 2019). Specifically, Save Our Springs argues *Center for Biological Diversity* does not account for the fact that the purpose of consultation is to ensure an action is not likely to jeopardize endangered species, an analysis that is incomplete without considering

cumulative effects, whether that analysis is required during an informal consultation or not. (Dkt. 37, at 28–29).[5]

Defendants vehemently disagree with Save Our Springs' assertion that they were required to consider the project's cumulative effects. (Dkt. 40, at 32–33; Dkt. 41, at 33–35). In support, Defendants also cite *Center for Biological Diversity*'s determination that analyses of cumulative effects are not required during informal consultations. 2019 WL 12313647, at *22–23. The Court agrees. Under the regulations as they were written at the time of the initial concurrence, the informal consultation section made no mention of cumulative effects. 50 C.F.R. § 402.13 (2016). Further, the Court concurs with *Center for Biological Diversity*'s analysis regarding the Ninth Circuit case *Conservation Congress v. United States Forest Service*, 720 F.3d 1048, 1055–56 (9th Cir. 2013). Discussing the case, the court in *Center for Biological Diversity* noted, "[u]nder its implementing regulations, [the Service] has clearly created an affirmative duty to consider cumulative effects during formal consultation, but there is no such duty during informal consultation. When pressed by the conservation group in *Conservation Congress* to read a requirement to consider cumulative effects into Section 402.13's silence on cumulative effects, the court declined, contrasting the express creation of a duty to consider cumulative effects for formal consultations with the absence of any such duty in the regulatory section on informal consultation." *Id.* at *23 (internal citations and quotations omitted). The Court likewise declines to impose any such requirement on the Defendants in this case, and thus finds that Defendants are entitled to summary judgment regarding the issue of cumulative effects.

---

[5] Save Our Springs makes additional arguments against the applicability of *Center for Biological Diversity*, including that the Oak Hill Project is significantly large than the Mopac project at issue in *Center for Biological Diversity*, suggesting a larger environmental impact and that the Mopac project is now complete and therefore should be factored into the Oak Hill Project's environmental baseline. (Dkt. 43, at 30–31).

### D. Third Cause of Action: Reinitiation of Consultation

Save Our Springs seeks summary judgment on its claim that events that occurred after the 2017 consultation process required TxDOT and FWS to reinitiate consultation, which they failed to do. (*Id.* at 30). Specifically, Save Our Springs points to the discovery of the Barton Springs Salamander at Backdoor Springs and the Atlas 14 rainfall study as events that should have prompted reinitiation. (*Id.* at 30–31). Regarding the discovery of the Barton Springs Salamander at Backdoor Springs, Save Our Springs argues that the communication between TxDOT and FWS about the discovery shows numerous mistakes regarding the distance of the salamanders from the project site. (*Id.*). Save Our Springs argues that TxDOT's ultimate conclusion that the Barton Springs Salamander site at Backdoor Springs is only 1.68 miles away from the project site warranted further consultation between TxDOT and FWS. (*Id.*). Save Our Springs makes a similar argument about the Atlas 14 report: TxDOT and FWS were required to reinitiate consultation "[i]f the identified action is subsequently modified in a manner that causes an adverse effect on any listed species . . . ." FWS1466. As the Atlas 14 report resulted in the addition of columns and expanded bridge lengths, Defendants were required to consult regarding the possible effects. (Dkt. 37, at 31).

TxDOT and FWS both filed cross motions for summary judgment on this issue. (Dkt. 40, at 33–36; Dkt. 41, at 35–36). The Defendants note that reinitiation of consultation is required:

(1) If the amount or extent of taking specified in the incidental take statement is exceeded;
(2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
(3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
(4) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16(a).

27

FWS acknowledges that the discovery of the Barton Springs Salamander at Backdoor Springs (closer to the project site than originally believed) satisfied the first half of the second basis for reinitiating consultation; namely, that new information revealed effects on a listed species. (Dkt. 41, at 35). However, both Defendants argue that this discovery would not affect the species "to an extent not previously considered," therefore negating the need for reinitiation. (*Id.*; Dkt. 40, at 33–34). The reason, they assert, is that they were always aware that the Barton Springs Salamander was located downgradient from the project site and that the distance from the site did not matter, because the project's water quality plans are premised on best management practices that will prevent contaminants from ever making it into the waterways in the first place. (*See id.* at 34) ("TxDOT has not relied on [the Oak Hill Project's] distance from [the Barton Springs Salamander] habitat as a justification for minimizing or discounting water-quality impacts . . . ."); *see also* FWS1501–02 (noting that the established best management practices would protect all salamanders downgradient from the project). Therefore, the discovery of the Barton Springs Salamander closer to the project area than initially believed did not require reinitiation of consultation.

Defendants also dispute that the Atlas 14 report required reinitiation. (Dkt. 40, at 35; Dkt. 41, at 36). TxDOT states that while the Atlas 14 data occasioned modifications to the Oak Hill Project plan—including raised bridges and roadway profiles, larger culverts, and altered drainage features—TxDOT reevaluated whether its initial reports to FWP regarding the project's impacts on the salamanders remained valid. (Dkt. 40, at 35). TxDOT reported its proposed changes, their effects, and TxDOT's strategies to mitigate those effects, to FWS in January 2020. FWS1512. FWS reviewed the report and again concurred with TxDOT's assessment, stating "[d]ue to the avoidance and minimization measures proposed by TxDOT, the net reduction in the amount of TSS leaving the project area, avoidance of the aquifer during excavation and construction, and the implementation of void monitoring protocols included in the project description, *we reiterate our*

28

*concurrence with TxDOT's conclusion that the project may affect, but likely will not adversely affect"* the

salamander species. FWS1879 (emphasis added). Based on their conclusions that the modifications

to the project would still be subject to best management practices and void mitigation measures,

Defendants argue the Atlas 14 modifications will not cause any effect on the salamanders that they

had not previously considered, and they therefore were not required to reinitiate consultation.

The Court agrees and finds that Defendants are entitled to summary judgment on this claim.

The Court may only find agency action to be arbitrary and capricious when "the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n of US., Inc.*, 463 U.S. at 43. Defendants have

successfully demonstrated that they researched and considered whether the new Barton Springs

Salamander location or the modifications to the project based on the Atlas 14 report would impact

the salamanders "in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a); *see*

FWS1501–02; FWS1512. Their conclusion that the impact on the salamanders would not change

was rationally based on this research. *See id; see also Motor Vehicle Mfrs. Ass'n of US., Inc.*, 463 U.S. at 43

(1983). Therefore, the Court finds that Defendants have established that there is no issue of material

fact as to whether they were required to reopen the consultation, and that they are entitled to

judgment as a matter of law.

### E.  Fourth Cause of Action: TxDOT's Independent Duty to Ensure Against Jeopardy

Finally, Save Our Springs seeks judgment in its favor based on a finding that TxDOT failed

to satisfy its independent duty to ensure against species jeopardy. (*Id.* at 31). Save Our Springs argue

that TxDOT has a substantive duty—distinct from its procedural obligations under the ESA—to

protect listed species. (*Id.* at 31) (citing Order on Motion to Dismiss, Dkt. 22; *Sierra Club v. Yeutter*,

926 F.2d 429, 439 (5th Cir. 1991); *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 596

(9th Cir. 2014); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir.

1990)). To satisfy its substantive obligations, TxDOT may not solely rely on the consulting agency's

recommendations to establish compliance with the substantive requirements of the ESA. *Fla. Key*

*Deer v. Brown*, 364 F. Supp. 2d 1345, 1358 (S.D. Fla. 2005). Save Our Springs argues that TxDOT

failed to satisfy its substantive obligations, and this failure rises to the level of arbitrary and

capricious. (Dkt. 37, at 31–32).

Defendants filed cross motions for summary judgment as to Save Our Springs' claim that

TxDOT acted arbitrarily and capriciously by failing to satisfy its independent duty to ensure against

jeopardy. (*See* Dkt. 40, at 36). Specifically, TxDOT argues that it conducted a variety of analyses on

its own accord to assess the potential impact of the Oak Hill Project on the salamander species. (*Id.*).

The Court agrees that the administrative record is replete with documents demonstrating TxDOT's

numerous studies of the project's impacts. *See, e.g.*, TAR3710 (biological resources technical report

published on the Oak Hill Project in 2015); FWS928–1379 (biological assessment containing a

preliminary water quality analysis and proposed best management practices); TAR6441 (notice

advising FWS that the Barton Springs Salamander had been discovered outside of Barton Springs);

FWS1479–80 (report to FWS on error calculating TSS load). The Court finds that this evidence

suffices to demonstrate TxDOT's compliance with its own substantive obligations under the ESA.

Further, "[b]ecause this court concludes that the Service's actions are not arbitrary and capricious,"

*see supra* Part III(C)(1)–(2), "the court also concludes that TxDOT's reliance on the Service's

concurrence is also not arbitrary and capricious." *Ctr. for Biological Diversity*, 2019 WL 12313647, at

*25. As such, the Court will grant summary judgment to Defendants on this claim.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Save Our Springs' Motion for Summary Judgment, (Dkt. 37), is **DENIED**.

**IT IS FURTHER ORDERED** that TxDOT's Cross Motion for Summary Judgment, (Dkt. 40), and FWS's Cross Motion for Summary Judgment, (Dkt. 41), are **GRANTED.**

**IT IS FINALLY ORDERED** that Save Our Springs' claims are **DISMISSED WITH PREJUDICE**.

The Court will enter final judgment in a separate order.

**SIGNED** on March 31, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE